

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **Romeo Chicco, individually and on behalf of others similarly situated,** | **Case No.:** |
| | **CLASS ACTION** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| v. | **1) THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681 ET SEQ.;** |
| **General Motors LLC, OnStar LLC, LexisNexis Risk Solutions Inc.** | **2) THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 ET SEQ.** |
| Defendant. | **3) FLORIDA COMMON-LAW INVASION OF PRIVACY** |
| | **JURY TRIAL DEMANDED** |

## INTRODUCTION

1. The United States Congress has found that inaccurate consumer reports directly impair the efficiency of our economy and undermine public confidence. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy. Because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer

information, the FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy. The FCRA also imposes duties on the sources that provide consumer information to credit reporting agencies, called "furnishers."

2. The purpose of the Deceptive and Unfair Trade Practices Act is to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce and to make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

3. ROMEO CHICCO ("Plaintiff"), by Plaintiff's attorneys, brings this action to challenge the actions of GENERAL MOTORS LLC ("GM"), ONSTAR LLC ("OnStar"), and LEXISNEXIS RISK SOLUTIONS INC. ("Lexis") (or jointly as "Defendants") regarding erroneous reports of derogatory and negative driving information made without Plaintiff's knowing consent. Additionally, this illegal transfer and publication of data constitutes an invasion of privacy. Defendant's

2

collective conduct caused Plaintiff damages and significant emotional distress.

4. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

5. While many violations are described below with specificity, this Complaint alleges violations of the statute cited in its entirety.

6. Unless otherwise stated, all the conduct engaged in by Defendants took place in the Southern District of Florida.

7. Any violations by Defendants were knowing, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

8. Unless otherwise indicated, the use of Defendants' names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendants named.

## JURISDICTION AND VENUE

9. This Court has federal question jurisdiction because this case arises out

of violation of federal law. 15 U.S.C. §1681 *et seq.*; 28 U.S.C. §1331; Jurisdiction arises for Plaintiff's supplemental state claims under 28 U.S.C. § 1367.

10. This action arises out of LexisNexis' violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"); GM and OnStar's violations of Florida's Deceptive and Unfair Trade Practices Act, §502.201 *et seq.*; and GM and OnStar's violations of Florida's common law invasion of privacy.

11. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because Plaintiff is a resident of Palm Beach County, State of Florida and Defendants are subject to personal jurisdiction in Palm Beach County, State of Florida as they conduct business there, and the conduct giving rise to this action occurred in Florida. 28 U.S.C. § 1391(b)(2).

## PARTIES

12. Plaintiff is a natural person residing in the County of Palm Beach, State of Florida. In addition, Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

4

13. Defendant GM is a corporation registered with the Florida Secretary of State doing business in the State of Florida.

14. Defendant OnStar is a corporation registered with the Florida Secretary of State doing business in the State of Florida.

15. Defendant Lexis is a global data and analytics company registered with the Florida Secretary of State doing business in the State of Florida.

16. Defendants GM and OnStar are furnishers of information as contemplated by 15 U.S.C. § 1681s-2(b) that regularly and in the ordinary course of business furnish information to a consumer credit reporting agency.

17. Defendant Lexis is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f), doing business in Florida.

### GENERAL ALLEGATIONS

18. At all times relevant, Plaintiff was an individual residing within the State of Florida.

19. At all times relevant, Defendants conducted business in the State of Florida.

20. On or around November 16, 2021, Plaintiff purchased a new 2021 Cadillac XT6 from Ed Morse Cadillac (the "Dealership") in Delray Beach, Florida.

21. The purchase agreement, signed and initialed by Plaintiff, provided an itemization of sale. The itemization included the purchase price, pre-delivery service fees, tag agency fees, warranty fees, taxes, and official fees (title, registration, lemon law, etc.).

22. The purchase agreement makes no mention of OnStar, LexisNexis, data-sharing, or anything privacy-related.

23. Representatives from the Dealership allege that OnStar Smart Driver "isn't something we sell at the store."

24. Moreover, representatives from the Dealership allege that "OnStar won't release information to a dealer regarding when and who signed up for this [data sharing] program."

25. Shortly after his purchase, Plaintiff downloaded the MyCadillac Application to his mobile device.

26. He then received an email on November 18, 2021, which stated:

Romeo, your Cadillac Connected Services trial and OnStar®
Safety & Security coverage has begun. To get started, **push
your blue OnStar button**, and connect with an Advisor for your
Welcome Call. They'll help you set up your personal account
and give you a walk-through of the services below.

**2 YEARS OF CONNECTED NAVIGATION + ONSTAR SAFETY & SECURITY**

| | | |
|---|---|---|
| ✓ Automatic Crash Response | ✓ OnStar Guardian™ app | ✓ Stolen Vehicle Assistance |
| ✓ Emergency Services | ✓ Crisis Assist | ✓ Connected Navigation |

**6 MONTHS OF REMOTE ACCESS**

| | | |
|---|---|---|
| ✓ Remote Key Fob | ✓ Vehicle Diagnostics | ✓ In-Vehicle App Access |
| ✓ Vehicle Status | ✓ Dealer Maintenance Notification | ✓ Vehicle Locate |

**IN-VEHICLE DATA**

✓ 3 GB or 3 months of data (whichever comes first)

27. Plaintiff did not want OnStar services and so he did not push the blue
OnStar button "to get started." The email provides no mention of
OnStar's Smart Driver Program.

28. Plaintiff began to receive diagnostic emails from OnStar, but he
believed that they were provided by his MyCadillac App. Furthermore,
neither the welcome email nor the diagnostic reports mentioned data-
sharing to third parties.

29. Plaintiff's billing statements do not include any purchases or payments for OnStar-related services.

30. In or around February 2024, the Dealership provided Plaintiff with OnStar's Smart Driver FAQ. The relevant portion explains that OnStar only collects driving behavior data with explicit consent:

| Why do customers have to enroll separately in OnStar Smart driver from their basic OnStar services? | We do not collect driving behavior data on our customers unless they consent to us doing so. You must enroll separately to provide consent specific to OnStar Smart Driver. |
| --- | --- |
| What information does OnStar Smart Driver capture? | Upon consent and enrollment in OnStar Smart Driver, depending on vehicle capability, the vehicle will collect specific driving behavior data, including hard braking events, hard acceleration events, speeds over 80 miles per hour, average speed, late night driving, when a trip occurs and the number of miles driven. |

31. As of March 12, 2024, Plaintiff's Vehicle Profile on GM's online Cadillac Owner Center states, "Your vehicle is not connected to an OnStar Account."

32. Throughout 2021, 2022, and most of 2023, Plaintiff retained the same insurance provider, which repeatedly renewed his insurance policy.

33. In or around December 2023, Plaintiff's insurance provider told him that they no longer provided insurance to persons in the State of Florida.

34. On or about December 18, 2023, Plaintiff reached out to several insurance providers using their online services. Each insurance provider rejected Plaintiff's attempt to purchase insurance.

35. Plaintiff, perplexed, finally called Liberty Mutual. Plaintiff asked why he had been rejected. The agent explained that Plaintiff had been rejected because of information in Plaintiff's LexisNexis report. The agent provided Plaintiff instructions on how to access his report.

36. Plaintiff requested his Lexis Nexis report. It took two to three weeks before Plaintiff received his LexisNexis consumer disclosure. During that time, he spoke to a local insurance agent who helped him find an insurance provider; his rates were now nearly doubled.

37. Plaintiff felt extremely frustrated and shocked by the entire situation.

38. In or around January 2024, Plaintiff received his requested LexisNexis consumer disclosure. The report, as of December 18, 2023, had 258 recorded driving events under the "Telematics" subsection. Each driving event included trip details that show the start date, end date, start time, end time, acceleration events, hard brake events, high speed events, distance, and VIN.

39. Notably absent from the consumer report is any context related to these driving events. For example, "Record 5" identifies two "Acceleration Events" and one "Hard Brake Event[]." The report does not define what either of these mean nor how they are calculated. Furthermore, the

report does not explain how or why Plaintiff might have experienced these events. Stating these events, by themselves, says nothing of the other driving conditions and factors Plaintiff may have experienced.

40. On January 11, 2024, Plaintiff called Lexis. He asked them why his driving data had been collected without his consent. Lexis informed him that he should call GM.

41. Plaintiff called GM that same day. They explained that telematics data is sent through OnStar. Plaintiff told GM he never enrolled in OnStar. The representative confirmed that Plaintiff did indeed have an OnStar plan attached to his vehicle and transferred Plaintiff to an OnStar representative. The representative said the only way for telematics data to reach insurance companies is if Plaintiff opted-in with his insurance company to get a safe driving discount.

42. Plaintiff had never opted into any insurance program that would have allowed his information to be shared.

43. Plaintiff spoke to a different representative at OnStar without anyone being able to tell him why OnStar distributed his telematics information without his consent.

44. On January 16, 2024, Plaintiff called LexisNexis again. He explained that he never authorized GM or for that matter, any company to share his driving information. The representative told Plaintiff that he could file a dispute with Lexis to have his telematics data removed.

45. Also on January 16, 2024, Plaintiff called GM to inquire about telematics data sharing. They immediately transferred Plaintiff over to OnStar. He spoke to a representative who informed him that the Smart Driver Program (which would authorize data-sharing to insurance companies) can only be enrolled through their website or on the MyCadillac Application. The representative then claimed that they spoke with an executive relations level representative. According to this representative, Plaintiff is not enrolled in the Smart Driver Program. Moreover, the representative said that Plaintiff *never* enrolled in Smart Driver, nor did he enroll at the dealership level. The representative reiterated multiple times that OnStar is not sending the data to Lexis and that Plaintiff needs to speak with OnStar's consumer privacy department.

46. Plaintiff immediately called the number provided and a representative instead explained that he needed to speak with a Cadillac representative.

47. When Plaintiff tried to speak with a Cadillac representative, they told him to speak with OnStar.

48. After all this back and forth, and still on January 16, 2024, Plaintiff spoke to representatives from OnStar. After having been transferred to three different OnStar representatives, Plaintiff finally spoke to an individual who told him about an "internal arrangement" OnStar has with insurance providers. Plaintiff once again explained that he never consented to distribute his driving information and asked to speak to a supervisor. After waiting some time, the representative said that the supervisor would call Plaintiff back; the supervisor never called Plaintiff back.

49. On February 12, 2024, Plaintiff called OnStar again. Plaintiff wanted to find out when he "enrolled" into OnStar's Smart Driver Program. The representative explained that Plaintiff would have enrolled online. Plaintiff said that he wanted to know the specifics because he never agreed to data-sharing by OnStar including the Smart Driver Program.

The representative would not provide this information to Plaintiff; however, they informed him that he could opt-out of the program. Plaintiff explained that he never opted *into* the program to begin with and felt angry that OnStar had enrolled him into the program. The representative then transferred him to someone else. This representative walked him through the MyCadillac Application to see if Smart Driver had been activated on there. During the process, Plaintiff noted that not only had Smart Driver not been visible on the application, but there is a button asking if he's "ready to activate [his] OnStar." The representative asked him to log into his GM account online to check his OnStar status there. After Plaintiff logged on, he followed the representatives' steps. Under Plaintiff's account, his vehicle showed an OnStar status of "not connected." Ultimately, the representative could not tell him when he had "enrolled" into OnStar or the Smart Driving Program.

50. Plaintiff is informed and believes that General Motors and OnStar sold and/or shared Plaintiff's driving data without his knowledge or consent.

51. This uncontextualized, misleading, and personal driving information on Plaintiff's consumer disclosure harms Plaintiff's ability to purchase car

insurance. Moreover, notwithstanding the extreme frustration and dissatisfaction with the entire ordeal, these disclosures harm Plaintiff's solitude and peace of mind.

52. Plaintiff would not have even bought the Cadillac vehicle to begin with had he known of this grave invasion of privacy.

53. The entire ordeal left Plaintiff hopeless and distressed because no matter who he spoke with, nobody could explain to him how his driving data had been publicly shared without his knowledge or consent.

54. Additionally, the data presented on the Lexis Consumer report is so decontextualized that it can hardly be called accurate. Nevertheless, insurance companies rely upon these consumer reports to determine pricing or flatly reject a potential customer, as has happened here.

55. Moreover, Plaintiff is informed and believes that GM and OnStar mislead individuals about their data-sharing practices. Plaintiff, with little assistance from OnStar or GM, investigated how his data reached Lexis. Plaintiff never knowingly consented to these practices. Thus, Plaintiff is of the belief that by downloading the "MyCadillac App", OnStar began to share his data.

56. The car purchase agreement said nothing of OnStar or data-sharing.

57. The 2021 Cadillac XT6 owner's manual provides that "[i]f the vehicle is equipped with OnStar *and has an active service plan*, additional data may be collected and transmitted through the OnStar system." (emphasis added). The manual then refers consumers "to the OnStar Terms and Conditions and Privacy Statement on the OnStar website."

58. As with the owner's manual, the MyCadillac Application Terms of Service incorporate the OnStar user terms and privacy statement. The MyCadillac Application Terms of Service then say that "[w]e may collect, use, and share information about you, including the location of your Device or Vehicle *as described in the Privacy Statement for Application Services available at* www.onstar.com/privacy." (emphasis added).

59. The OnStar User Terms explain that "GM collects, uses, and shares information from and about You and your Vehicle. The GM Privacy Statement describes what GM does with that information. *You consent to the collection, use, and sharing of information described in the Privacy Statement*[.]" (emphasis added)

60. OnStar includes a supplemental privacy statement for application services. It explains that Onstar collects and treats "information from you as described in the OnStar Privacy Statement."

61. Finally, the OnStar Privacy Statement, reads in relevant part:

> **Third-Party Business Relationships:** With business that GM enters into business relationships, such as SiriusXM, in connection with their products and services; research institutes, for research and development purposes (*for example, improving highway safety*); or dealers, fleet, or rental car companies, for service or maintenance of your vehicle. We may also share data with third parties for marketing activities (with necessary consents) or where you have elected to receive a service from them and/or authorized them to request data from GM (*for example, financial organizations who offer financing for the purchase or lease of GM vehicles or usage based insurance providers*).[1]

62. This section, neatly hidden on their website, and made inconspicuous through the downloading of mobile applications, at worst, does not grant OnStar or GM the right to furnish car driving data to Lexis and is ambiguous at best. The applicable section—"where you have elected to receive a service from them and/or authorized them to request data from GM"—does not mention Lexis and is buried at the tail end of the paragraph. Furthermore, it shifts the onus on consumers, who are likely

---

[1] https://www.onstar.com/legal/privacy-statement. Last visited March 8, 2024.

already unaware that car data is being tracked and shared. If consumers are aware, they would then have to comb through every insurance carrier's clickwrap agreements to get a quote.

63. This scheme is deceptive, unfair, and misleading to consumers.

64. Plaintiff is informed and believes that Lexis continues to report this damaging information on consumer disclosures without regard to their context. This information, standing alone, is incomplete. These data metrics do not provide an accurate picture of the individual to whom the report relates.

65. And like with Plaintiff, much of this information is likely reported without consumers' knowledge.

66. Plaintiff's ability to buy insurance has been harmed because of Defendants' actions.

67. Plaintiff's peace of mind and privacy has been gravely invaded by Defendants' actions.

68. As a result of Defendants' conduct, Plaintiff suffered other actual damages in the form of mental anguish and emotional distress, which manifested in symptoms including but not limited to stress, anxiety, worry, restlessness, irritability, embarrassment, loss of sleep, shame,

feelings of hopelessness, and helplessness all impacting his job and personal relationships.

69. On March 11, 2024, the New York Times reported an investigative piece about this exact issue.[2] The article highlights individuals who have had their insurance rates increase due to Lexis publishing, among others, General Motors car drivers' data. For one consumer "[i]t felt like a betrayal" because GM took "information that [he] didn't realize was going to be shared[.]" While the article acknowledges that this data-sharing sometimes happens "with a driver's awareness and consent[,]" other times "something much sneakier has happened":

> "Modern cars are internet-enabled, allowing access to services like navigation, roadside assistance and car apps that drivers can connect to their vehicles to locate them or unlock them remotely. In recent years, automakers, including G.M., Honda, Kia and Hyundai, have started offering optional features in their connected-car apps that rate people's driving. Some drivers may not realize that, if they turn on these features, the car companies then give information about how they drive to data brokers like LexisNexis… Especially troubling is that some drivers with vehicles made by G.M. say they were tracked even when they did not turn on the feature — called OnStar Smart Driver — and that their insurance rates went up as a result… Even for those who opt in, the risks are far from clear. I have a G.M. car, a Chevrolet. I went through the enrollment process for Smart Driver; there was no warning or prominent disclosure that any third party would get access to my driving data."

---

[2] https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.  Last  visited March 11, 2024.

## CLASS ALLEGATIONS

## PROPOSED CLASS

70. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23,

    on behalf of himself and all others similarly situated.

71. Plaintiff brings this case on behalf of a Classes defined as follows:

    Florida Deceptive and Unfair Trade Practices Act Class

    **All persons, who from four years prior to the filing of this action who (1) had their car's driving data (telematics) collected and shared with LexisNexis; (2) without those persons' consent.**

    Invasion of Privacy Class

    **All persons, who from four years prior to the filing of this action who (1) had their car's driving data (telematics) collected and shared with LexisNexis; (2) without those persons' consent; and (3) those persons' telematics appeared on at least one LexisNexis consumer disclosure.**

    FCRA Class

    **All persons, who from two years prior to the filing of this action who (1) had their car's driving data (telematics) collected and shared with LexisNexis; (2) without those persons' consent; and (3) those persons' telematics appeared on at least one LexisNexis consumer disclosure.**

19

72. Defendants and their employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class but believes the Class members number in the several thousands, if not more. The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

**NUMEROSITY**

73. Upon information and belief, Defendants OnStar and GM shared millions of consumers' driving behavior data to LexisNexis without their consent.

74. The exact number and identifies of the Class members are unknown at this time and can only be ascertained through discovery. Identification of the Class members is a matter capable of determination from Defendant's records.

**COMMON QUESTIONS OF LAW AND FACT**

75. There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

a.  Whether Defendants GM and OnStar collected and tracked Plaintiff's and Class members' driving behavior data through their GM mobile app.

b.  Whether Plaintiff and Class members knowingly consented to have the data shared by downloading a GM mobile app.

c.  Whether Defendants' practices are considered unfair and/or deceptive.

d.  Whether Defendants' practices constitute an invasion of privacy.

e.  Whether Defendants' conduct was knowing and willful.

f.  Whether Defendants' are liable for damages, and the amount of such damages.

g.  Whether Defendants' should be enjoined from such conduct in the future.

76. The common questions in this case are capable of having common answers. If Plaintiff's claim that Defendants routinely track driving data is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

**TYPICALITY**

77. Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

**PROTECTING THE INTERESTS OF THE CLASS MEMBERS**

78. Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

**PROCEEDING VIA CLASS ACTION IS SUPERIOR AND ADVISABLE**

79. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford

individual litigation, the court system would be unduly burdened by individual litigation of such cases.

80. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

## COUNT I

### KNOWING AND/OR WILLFUL VIOLATION OF THE FCRA, 15 U.S.C. § 1681e(b)

**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST LEXISNEXIS ONLY)**

81. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

82. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).

83. By LexisNexis reporting these data metrics, insurance carriers and others who view this information receive an inaccurate representation of Plaintiffs' and other consumers' driving abilities.

84. LexisNexis has failed to maintain procedures to maintain maximum possible accuracy regarding Plaintiff and the Class Members' driving data.

85. The foregoing acts and omissions constitute numerous and multiple willful, reckless or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

86. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

87. As a result of each and every negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

## COUNT II

### VIOLATIONS OF THE DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 ET SEQ.

**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST ALL DEFENDANTS)**

88. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

89. The foregoing acts and omissions constitute unfair and deceptive acts by all defendants in the conduct of commerce.

90. Each defendant engaged in this deceptive scheme to share personal driving data without Plaintiff's knowledge.

91. OnStar and GM should not have shared this information without the Plaintiff's informed consent, if at all, and Lexis should not have published it.

92. Furthermore, all Defendants should have realized that sharing and publishing this information, without any context, inaccurately portrays consumers' driving experience.

93. As a result of Defendants' conduct Plaintiff has suffered damages.

## COUNT III

### VIOLATIONS OF FLORIDA COMMON-LAW INVASION OF PRIVACY

**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST ALL DEFENDANTS)**

94. "Florida Courts recognize the invasion of privacy tort under common law."[3]

95. The elements under a "public disclosure of private facts" cause of action include (1) the publication; (2) of private facts; (3) that are offensive; and (4) are not of public concern.[4]

96. Additionally, invasion of privacy can involve the "intrusion upon seclusion" which is defined as where one "'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns…if the intrusion would be highly offensive to a reasonable person.'"[5]

97. The foregoing acts and omissions constitute Plaintiff's invasion of privacy because Defendants are publishing misleading information about Plaintiff's driving data to third parties, which is offensive. Additionally, Defendants' highly offensive actions—sharing personal driving data to third parties—intrude into Plaintiffs private affairs.

---

[3] *In re Mednax Servs.*, 603 F. Supp. 3d 1183, 1225 (S.D. Fla. 2022)
[4] *Id*.
[5] *Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 656 (Fla. Dist. Ct. App. 2021); quoting Restatement (Second) of Torts § 652B (Am. Law Inst. 1977).

98.  As a result of Defendants' conduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, on behalf of himself and the other members of the Class, prays for the following relief:

- An award of actual damages pursuant to 15 U.S.C. § 1681n(a)(1);

- An award of statutory damages pursuant to 15 U.S.C. § 1681n(a)(1);

- An award of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2);

- Award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. § 1681n(a)(3), and 15 U.S.C. § 1681(o)(a)(1) against Defendants for each incident of negligent noncompliance of the FCRA;

- An award of actual damages pursuant to Fla. Stat. § 501.201 et seq.

- An award of costs of litigation and reasonable attorney's fees, pursuant to Fla. Stat. § 501.2105;

- An award for actual damages pursuant to Florida's common law invasion of privacy;

- An award for punitive damages pursuant to Florida's common law invasion of privacy;

27

- An injunction against Defendants' further data collection and/or sharing to third parties without their consent;

- Any other relief the Court may deem just and proper.

## TRIAL BY JURY

64. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: March 13, 2024                    Respectfully submitted,

BY: /S/ RYAN L. MCBRIDE_____
RYAN L. MCBRIDE, ESQ.
TRIAL COUNSEL FOR PLAINTIFF

Mohammad Kazerouni
Florida State Bar No. 1034549
**Kazerouni Law Grouo, APC**
245 Fischer Ave., Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
mike@kazlg.com

Ryan L. McBride
Florida State Bar No. 1010101
**Kazerouni Law Group, APC**
2221 Camino Del Rio S., #101
San Diego, CA 92108
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
ryan@kazlg.com